Afternoon, our first case is Kelly v. Kempfer. We have Mr. Whitney for the appellant and Mr. Walker for the appellant. Very good, you may proceed. Thank you, your honors. May it please the court. This appeal raises several issues, but the most important for this court to consider is that it upholds the solemn principle that it adopted in the in re estate of rival case. That the fiduciary duties of someone exercising a property power of attorney are so vitally important that they must supersede the presumption of donated intent that attaches to a joint account. This court, I submit, should not countenance the theory that's being propagated by defendant that since the defendant and the decedent shared a joint account, therefore plaintiff had no expectancy to any funds that defendant converted that otherwise would have floated to those accounts. In the context of this case, as in the precedent established by rival, that is tantamount to stating that if I hold the power of attorney for a property for someone with whom I also share joint accounts, and then I have to begin exercising the power of attorney due to the poor health of the principal, then I have a license to disregard my duties as power of attorney and basically authorize an advance on the gifts that I think I'm going to receive later based on the expectation of the will. It's basically a theory that says, well, if we have joint accounts and I have power of attorney, I get to open my Christmas presents early. Fortunately, that's not the law. Fortunately, this court encountered very similar circumstances in the in re estate of rival case. This court said no. While there are conflicting presumptions, there is that presumption of donated intent when there's a joint account. As a matter of policy and in protecting, basically it made a statement about the need to protect elderly people or people who may be disabled from this kind of abuse. It said, no, we are going to find that the presumption of fraud attaching to gifts that benefit me as power of attorney is going to trump any presumption of donated intent flowing into the joint account. What we're asking this court to do on this appeal is basically uphold rival with respect to that argument. Now, granted, this argument is one that has been raised by defendant. The court below, I would point out, actually didn't even rely on that argument or didn't rely on that as one of its findings or conclusions of law. But I wanted to start there because this is a very important principle and defendant has raised it on this appeal as an additional ground to uphold the ruling of the court below. Was there any evidence presented about the circumstances of the creation of the joint accounts? In other words, was there any evidence that would rebut the presumption of donated intent? I think that there was some. One, there were two accounts. One was created long before the power of attorney. One was created more since the creation of the power of attorney. And I believe the testimony was around the same time in 04 or 06. It was the latter account that the evidence showed that defendant was using more frequently in her capacity as power of attorney because the reason they created this second account was because it was handier for her. It was in Colterville. And so most of the transactions occurring after 2006, which is November 2006, which is the relevant period, were based on that account. Of course, what we're arguing is that money that should have gone to the account never did. But in any event, that was the main vehicle for a defendant to exercise her power of attorney. Accordingly, and I cite it in our reply brief, there is case law that says basically that when the joint account is created after the power of attorney, that further weighs in favor of the presumption of fraud with respect to the suspect transactions. And, of course, the weight of the evidence was that that was the vehicle, that the decedent, Kelly, had been receiving different sources of income, dividend checks, Social Security, and pension payments. The pension payments had been more or less going into the account, but the dividend and the Social Security, that's probably where most of the deposits were not made and ended up elsewhere. And as we point out in our principal brief, there was a large discrepancy. A lot of this case was based on the numbers, literally not adding up. And it was during that time frame, after the second account was created, that that occurred. Is the question of diminished capacity one that should have been the subject of a directed verdict? And shouldn't the trial court have waited, given that to a jury? Well, I think it should have given the whole thing to a jury, of course, Your Honor. I guess my best answer to that would be I don't think that was really an issue because we didn't have to prove diminished capacity to prove conversion. I know that's an argument on this appeal, but there is absolutely nothing in the case law that says you have to prove diminished capacity to prove forceless interference with expectancy of an inheritance. So they're claiming you should have brought that in the probate proceeding? That's one of their arguments, that it should have been. But again, there is absolutely no authority for this proposition. In fact, the authority is to the contrary. The authority is that you have a right to elect your remedies. You have a right to bring this as an independent action. The case authorities that were cited by defendant for the proposition that, oh, it should have been brought in that probate case, were all cases that were predicated on the premise that there was a will contest. That's Roessler or Roessler, I don't know. Yeah, there was. That's all right. It began with an R. Yeah, the Roessler case and the Robinson case also began with an R. That's the other one that I think that principally relying upon. But as defendant admits in his brief, there was no basis for a will contest here. That was simply not the case. Defendant urges the court to kind of extend the authority of Robinson and Roessler to encompass cases like this one. But I submit that that would basically be reversing 31 years precedent, saying that, no, you can bring this as an independent court because that's what it is. And in the context of this case, that made the most sense because what we're talking about is both tangible objects and funds that otherwise we contend should have flowed into the estate. Was the probate case closed in this case before this suit was filed? Not before the suit was filed, but before the case came to trial. Okay, it was still pending at the time this was filed. Yeah, there were still some other proceedings going on. I guess probably the second most important issue on this appeal with respect to the actual basis of the lower court's decision is whether or not one of the arguments made by the lower court or findings was that Plaintiff's complaint didn't sufficiently allege the kind of conversion that actually was produced. It was presented at trial. And our response to that is basically twofold. One, that depends on a hyper-literal reading of the language in the complaint. What the complaint alleged is that it was the defendant had been, among other things, had been converting Kelly's funds from an account at these two banks for her own use and benefit and then converting dividend checks intended for Kelly for her own, the decedent, for her own use and benefit. Well, I think what the lower court was basically saying was, well, you're not literally saying that you converted the funds that were in the account. You're saying you were converting the funds in the form of checks that were cashed and never made it into the account. And so you really should have pled that and you didn't plead that and so on. Of course, we did plead the dividend checks. And then it came down to, well, we don't have enough evidence that it was the dividend checks that were being converted versus the Social Security, the pension checks. Well, I would make two points regarding that. One, actually, there was evidence that the defendant testified that what she regarded as the smaller checks, the dividend checks, was the one she would cash to pay for incidentals, supposedly. So there was evidence of that. Secondly, to the extent that we found it difficult to prove which checks were being cashed and which weren't in the other categories, well, that is also on the defendant. This was someone who had power of attorney but did not exercise or follow her fiduciary duty to keep adequate records. Instead, her testimony was, well, we had bank records and I just relied on the bank records. I used these two accounts. Everything was in the bank records. And then we got the proverbial shoebox of receipts, which was presented as one of the exhibits. This shows, here's all the receipts for the things I bought with cash, which, again, didn't add up. It came to, some of them were unreadable, but as I point out in the brief, it maybe came to $1,500 at the most. It was something in that ballpark. It nowhere near accounted for the huge discrepancy between the income that we know Kelly received and the funds that actually made it into these two accounts. Now, there's two accounts. Tell me about the joint account, because they claim that you failed to provide any evidence of an expectancy in the joint account. Yeah, and this is maybe conceptually the biggest difficulty here, because, you know, taken literally, you can understand that argument. Because if, let's say there was no issue of a power of attorney, the decedent and the family member have a joint account, the decedent passes away. Automatically, it goes to the survivor on the joint account. You can understand that, but that's precisely the kind of issue that was addressed in the Rival case. And that basically, in a sense, you can argue it's a legal fiction, but it's an important legal fiction because it supports a public policy. That we don't want to countenance, the legal system should not countenance people diverting funds because they have power of attorney. Because, you know, on the grounds that, well, I have this joint account anyway, so it's going to be mine anyway. No, this court has already said no, you don't do that. So, in a sense, that's kind of a legal fiction, but you can understand why the legal fiction exists. Suppose, for example, that in 2008, the decedent Kelly, instead of his health failing, had gotten better and decided, you know what, I'm not sure that I like what my daughter Deborah is doing in managing my funds, I'd like to take some of that money out and put it into a savings account where it will flow to the estate. What if the money's gone? What then? Well, let's take the other side of that. If it truly was a joint account, you know, before he died, she could have taken it all out and done something else with it too. Well, she could have except not without getting into a lot of trouble in this case because, as she testified, those accounts, she used those accounts as a tool to exercise her power of attorney. It was only his money that went in, only his expenses and bills that were being paid out of it. Well, I mean, that gets back to my question about was there any evidence that rebutted the presumption of donative intent? Because if the presumption of donative intent, I mean, if it was truly a joint account, then either joint tenant has the right to withdraw all or part of it at any time, and the survivor inherits or keeps whatever's left at the time of the death of the joint tenant. I mean, was there any evidence that this was only for the convenience to pay his bills, that sort of thing? Absolutely. There's been some testimony to that effect. I mean, the fact that she didn't keep separate records, part of the reason she didn't keep separate records was, well, it was only his stuff were in these accounts. The inference was that she was using the bank records as kind of her method of bookkeeping because that was only his money that was in there. So, yes, by title, it was a joint account, certainly, but that's not what she was using it for. She was using it as the vehicle to administer his funds as power of attorney, and I think that was a crucial point that the court below failed to acknowledge, failed to recognize. So, and that's part of the reason why we believe that there was, indeed, an expectancy here. I might add to that. Let me just ask another question because it gets a little confusing here. I mean, if you're on a joint account, you don't have to have a power of attorney to write checks out of it. Right. And so, but you're saying that she testified that that's how she used the joint account was through the power of her power of attorney. Yes, she testified that. And this is where things get mixed up for me. Sure, and here again is a point where I don't think the court below acknowledged this. She testified that beginning at least by November 2006, I was exercising my power of attorney. That's the capacity I was functioning. I mean, she didn't say capacity, but that's the essence of it. And actually, since July of 2006, she was writing all these checks. She was, she was really, we argued it was July. Her testimony was November, but, you know, our case does not live or die based on that five-month difference. So, there were two joint accounts. Yes. And the first one was created before the power of attorneys. Years ago, right, 1980. So, wouldn't that be a presumption of a gift there? That would certainly be a stronger presumption of a gift. And the second joint account was after the power of attorney, right? Correct. But they claim that was done by the father, not the daughter. The testimony was we went in and did it both together.   But again, the case law and the case decided in reply brief indicate that when you set it up afterward, that tilts in favor of a presumption of fraud, not the presumption of donated content. I don't know if there's other questions that we need to, I think we've already addressed the question of incapacity. Oh, another point that is definitely I want to bring to this court's attention is that we're also not dealing just with money. We're also dealing with some tangible objects. Now, granted, from our perspective, that's not the weightiest part of the case. But here we have the evidence was that the defendant had received a small gun collection, some furniture, TV, a guitar, and some tools I think were basically it. And basically the testimony was that she had acquired them before the, Mr. Kelly passed away. And kept them, never turned them over to the estate. Well, that sounds like conversion to me. And I think that was pretty weighty evidence of conversion. She did not, there was no evidence these things were gifted to her per se. She testified, never talked about the, you know, the guitar or the gun collection. It simply went to her home and she kept it, never turned it in. So at least on that part of the case, I don't understand why the court below dismissed it. It just, it seems to make no sense at all. So I don't want the court to ignore that part of the case. Obviously we hope for reversal on all of the claims. But we, you know, we certainly want that one included. If the court has no other questions or concerns, I'll wait, reserve the rest of my time on rebuttal. Thank you, sir. You'll have time for rebuttal. All right. Thank you, Your Honor. All right. Mr. Walker. Thank you, Your Honor. Thank you. May it please the court. I think I need to spend a little bit of time based upon what brought us to where we were at. It's uncontroverted that in November of 2004, Mr. Kelly received the services of an attorney and prepared a health care card attorney, property card attorney. Way back in the 80s, he went to see a lawyer and got a will. In 2007, and there was a summary judgment motion that was granted by the court, Mr. Kelly had a great deal of CDs and other accounts at the First National Bank of Steel that were held jointly between himself and Ms. Kempfer, defendant to Napoli in this case. The summary judgment was granted in 2000 based upon the transaction that took place in October of 2007 at attorney Mike Howe. Mr. Kelly went to the First National Bank, cashed in all of that money, went to go see a lawyer, went to go see Mike Howe, an attorney in Sparta. Mr. Howe set him up in an LPL account, and all of that money was created payable on death to Deborah Kempfer. The biggest issue in this case is when did a fiduciary duty attach? Their position is that in November of 2004, whenever the power of attorney was created, there's automatically a fiduciary duty. And whenever you read the case, the first white is the case, and it's cited in the Riebold case, there appears to be some sort of clove of this automatic fiduciary duty that attaches whenever somebody issues a power of attorney. However, the problem is, is that even by their own admission, and I disagree with some of their statements as far as it being in 2006, whenever she began exercising the power of attorney, it's clear from 2004 until 2006 that she was not exercising the power of attorney. And if that's the case, when did the fiduciary duty attach? And it quite frankly appears to be a case of first impression when it attaches. The trial court was of the opinion that it is a transactional basis. A power of attorney is by transaction by transaction. If I have a power of attorney and I grant that power of attorney to my wife and she needs to use it because I got involved in an auto accident to sell the house or to pay for a bill or do something, clearly the fiduciary duty attaches to the powers that you do as a power of attorney. The problem with this case is that we're stuck in this quagmire of a joint owner, which at the First National Bank of Steel bill account was clearly created in 1980. No objection to that. And she was a joint owner. She didn't have to be a power of attorney to use that account. Additionally, in the common law record, there is, and in all the discovery and exhibits, there is an account that was created in the end of 2005 at the First National Bank of Campbell Hill, also known as the Coulterville Banking Center over in Coulterville, which was in 2005, which even using their case, their argument that she began using the power of attorney in 2006, she still wasn't exercising his power of attorney. I believe that they are overly reading the case of Riebold, and I agree that Riebold is kind of central to this case. And Riebold, and I'm going to refer to him as poor Trevor, I believe the grandson of Mrs. Riebold, got the power of attorney, and then immediately began what I even agree is self-dealing. He goes to the bank, puts him on the account, and it's questionable to me if it's even a joint account, and if you read the concurring opinion, even one of the appellate justices questioned if it was really a joint tenancy account, because it says POA. Does that mean that he's power of attorney, or does that mean that he's a joint accountant? And certainly, if Ms. Kempfer in this case was taking these dividend checks, taking the Social Security, which I agree she has a fiduciary duty if she's exercising the power of attorney. If she took those checks and started setting up her own accounts, if she started writing a check to herself for $5,000, obviously you did something wrong. But that's not this case. This case is she was a joint owner. She did not have to be a power of attorney to sign the check. And then most importantly, the biggest problem is, where is the proof that she did anything? In order to prove the tortuous interference of expectancy, we first have to have an existence of an expectancy, which clearly the will provided Mr. Kelly an existence of an expectancy. Then there has to be some sort of intentional interference with the expectancy. Then there has to be conduct that is itself tortuous, a reasonable certainty that the expectancy would have been realized but for the interference and damages. The reason that 2007 is important in my mind is that they've thrown together this exhibit list. They threw together these numbers, that in 2006 we had income here, we had deposits here, and we have this money left over. What happened to the money? What evidence did they prove that there was any damage? What evidence did they prove that Ms. Kelly, or strike that, Ms. Kempfer did anything wrong? There's none. Additionally, and I know it's kind of a silly argument, but again, if she would have put the money into both of those accounts, which clearly were created before she was a power of attorney, where is the reasonable certainty that the expectancy would have been realized before the interference? I'm not saying that this gives somebody a broad power to just do whatever they want to, but they have to prove this. And these were the elements that the trial court had a problem with, but they didn't prove anything. They were just throwing these numbers against the wall, and here it is. Figure it out for yourself, Jerry. Do you think they have to prove diminished capacity as an element of tortious interference? Based upon the way that they pled the cause of action, I believe so, because they pled diminished capacity as part of the cause of action. The conversion, I agree he would not, because conversion is a separate court in and of itself. It's the unauthorized assumption of the right to possession, ownership, and personal property. I clearly agree that if you're proceeding under the conversion, you would not have to prove diminished capacity. But that was kind of where the trial court, I believe, had a problem with the proof is where are we at? What are you saying that you're converting? And then they were not allowed, and I believe rightfully so, to amend their pleadings in order to do that. What about the personal property? I mean, the way I'm reading the briefs, your client basically admitted that, yeah, these were items that should have been in the estate, and that I didn't put them in the estate, and I've got them here. The truck, I would not agree that that's the characterization of it, because Mr. Kempfer, via deposition testimony, wasn't able to testify at the trial. And I believe Debra, at the trial, both testified that they received, that dad gifted the truck to them. But you got some other stuff at the trial. There were some personal items, but my argument with that is that Ms. Kempfer again, and it comes down to this initial thing, was this her account? Was it solely his account? She bought those items out of a joint account. My position is that it's her money, she used it, she had the money. Okay, so let me make sure. I thought these were items that the decedent had. I would agree that there were four weapons, a pistol, a Winchester double barrel, I don't know if there's any testimony about what the other two guns were, and a guitar. I clearly agree. Those are things that he had all along. Yes. That he owned at the time. And I would admit wholly that they never got turned over to the estate. And I take it there was no explanation for why those didn't become part of the estate. Ms. Kempfer testified at the trial that she contacted Mr. Kelly and said, you know, you can have one of the guns, you can come over and get whatever personal property you want. He declined. That's still different though, than making it part of the estate. And I guess, and if it were made part of the estate, Mr. Kelly would be entitled to some share. Of course. No question. So, I mean, this is, I know the very small part of the case, but how is there a directed verdict on that? Well, the court indicated that he felt, the trial court, being Judge Gross, that the, that there should have been a citation proceeding inside of the estate. And that because they chose to proceed this way, that it should have been based upon the case law, that it was, should have been in the citation proceeding. And that's certainly the way it usually is. Yes. But is there some case law that says you can use this alternative? The case law is that the courts certainly do not like tortious interference. And the case law is well settled that if there's any other remedy that's possible, that it's preferred that they select that method. But I'll be the first to admit that the cases that we've cited are not directly on point. They don't, it was other areas and they said yes or no, but in this case, the citation, to my opinion, has never been litigated. And I think there was no citation proceeding. There was no citation. Filed by anybody. Filed by anybody. Yes. Yes. That is correct. So, and the question that I still have, which remains unanswered to me. Okay. I'm sorry, I keep interrupting you, but let me ask you another question. Go ahead. In the estate, did anybody object to Mr. Kelly? Did anybody object to the inventory or challenge in any way whether it was complete? I mean, did the estate just go through and it was closed? Everybody was given notice? Well, there was not, we had to have an estate claim hearing relative to the fact Ms. Kempfer paid for the funeral home bill and wanted to be reimbursed out of the estate. My partner is actually the one that handled the estate. I did handle that hearing and Mr. Whitney can correct me if I'm wrong, but I don't believe that anybody filed any objections except for the funeral building, which we had to litigate and subsequently my client was reimbursed out of the estate before it was closed. Really, the biggest asset of the estate was there was litigation against the Colterville Care Center and that was resolved under a confidentiality agreement with the Colterville Care Center and once that was completed the estate was closed. But that's really, and I think two lots over in Percy paid the lots, a very minimal amount. But yeah, to my knowledge there was no objections filed except relative to the funeral home bill. And the other component, again, the damage that I have with the conversion claim to kind of answer your question again, you have to prove damage. There was no testimony whatsoever as to what the value of the guns were. There was no evidence really about anything. It was just throwing it against the wall and see what sticks. And to over, and again, it's just I believe there were overly reading rival. If you read rival, clearly Trevor in that case screwed up. However, it's important to note that the appellate court did affirm the fact that Trevor went to the bank with Grandma the day we got a power of attorney. The bank employee testified Grandma knew what she was doing. Grandma created a joint account with him and Trevor got that money. The rest of the money came to file whenever he started writing checks out to set up his own accounts. He thought that Edward Jones wasn't getting enough interest. So I'm going to go get money to Edward Jones. And additionally, they cite Elias, which is the 2010 or 2011 case, which is the same proposition. You clearly had somebody that was self-dealing. And I would completely agree with that. If she was writing checks for her own personal use and benefit, there's a problem, potentially a problem because of these conflicting presumptions. But that's not what happened. She did not do that. There's no evidence whatsoever actually how much that she did cash in. There's no evidence where it went. She testified that she took the small accounts and went to the manor at Mason Woods that she went to the Colterville Care Center and bought some personal items. And it's terribly important that the trial court granted a summary judgment motion for a transaction that took place near the end of 2007 that Mr. Kelly knew what he was doing. She wasn't self-dealing at that point. So the biggest money, the biggest discrepancy that we have is 2007, at least in October of 2007. I don't know what Walter Kelly did with his money that year. I don't think they know. And I sure don't think they would have convinced the jury where the money went. Did the trial court say that it was entering a directed verdict because the evidence was vague or very vague as to when the defendant was exercising the power of attorney? Yes. And I think that's the moving target here. To me, that's a threshold question. Is there this broad brush that the immediate time that someone exercises the power of attorney, even if it lays dormant in their desk drawer for five years, do they have a fiduciary duty at that time? And to me, it also gives me... So if something is vague or very vague, how do you enter a directed verdict? Well, the directed verdict is that if you look at the light, you know, at the evidence that's most favorable to the non-moving party, would any reasonable jury return a verdict? And that there was little or vague or no evidence. I don't know what the judge meant, but I think that's what the judge indicated. And that's where the diminished mental capacity, to my mind, came in in the trial court's mind is that we're not talking about having to necessarily prove the diminished capacity, but if Mr. Kelly was fine and functioning and Deborah Kemper wasn't serving as power of attorney, there was no fiduciary duty, no presumption of fraud attaches, and there was no evidence of that. There was no medical testimony that he was not good. And I believe it was early in 2008 when he suffered a massive stroke. So I want to thank the court for your time. Thank you for your argument. Mr. Whitney? Let me ask a question, Mr. Whitney. You know, when this suit was filed, the estate was open, okay, but your client didn't file a citation proceeding, didn't contest whether everything was in the inventory, made no objection. I mean, there is a principle, isn't there, of we need finality in probate proceedings, and when the estate's closed and everything's divided, that ought to be it. So why should you get to proceed with this separate proceeding when your client got all the notices and everything and didn't contest it in the probate proceeding? Well, I think the reason why the courts provide this kind of election of remedies is in the interest of finality. Now, of course, this is outside the record on this appeal. In fact, my client did file a motion for an accounting in the probate case, and there were some other things that happened there. Opposing counsel is right. We didn't bring out these specific claims, but as I pointed out, I believe it was in the reply brief, the interest of finality, the separate lawsuit. What if you have a case where there's a lot of creditors and, you know, with claims against the estate, and you have one person claiming tortious interference based on something that they believe should have benefited them? We're going to hold up the entire probate case in order to resolve this one outside case? And even if you brought it inside the probate case, as opposing counsel argued in his brief, how is that going to speed things up necessarily? I mean, in the instant case, we filed the tortious interference claim while the probate case was still pending. So it's not as if, I don't think it's a matter of judicial economy that you can really show one way or another that this might have made this problem matter. I'd like to address a few other things brought up by opposing counsel on oral argument. He spoke a little bit about Mr. Kelly going to see a financial advisor and getting some instruments. I can't swear to it, I haven't memorized the record on appeal, but I don't think that was really part of the record of this trial that that got in. In any event, the fact that that may have occurred in 2007, I think calls certain things into question, if anything, because, and this also addresses the point that counsel was raising about, you know, what happened in 2007 when, how do we know what Kelly was doing with his money? Well, the defendant's own testimony was that beginning in November 2006, she began exercising power of attorney because Mr. Kelly was incapable of managing his own affairs. Those were her words. It's in the record. That, you know, that to me settles it. At least by November 2006, she was clearly exercising power of attorney. Counsel argues, well, it's an open question. When exactly does the fiduciary duty attach? Actually, it's not. And reading from the rival opinion at page 889, once the power of attorney was executed, Trevor was responsible as a fiduciary to Wilma. Executed. As soon as a power of attorney is executed, it's a right-line rule, fiduciary duty attaches. Now, when you begin to exercise it in the real world, that's different. But as soon as you begin to exercise it, you have that fiduciary duty. It begins the moment you sign that document. What duty should she have exercised? Stopping him from spending his own money? No. Well, I don't think that if he was at the point where he was not capable of managing his affairs, certainly she might have taken action to prevent any foolish expenditures. But that was not an issue in this case. The only issue in this case was what she was doing with his money. And contrary to what counsel was saying about there was no evidence of anything, we were just throwing numbers up in the wall, no. It was pretty plain black and white. We had tax returns. We had definite numbers showing what his income was. We could measure that against what went into the bank account. We could measure that against the receipts that she claimed she spent the other money on. And then this amount of money that went into the trust accounts at the nursing home and the assisted living facility, and it doesn't add up. There's a huge gap. In 2006 it was pretty large, but that year there was maybe half power of attorney, maybe half not. But in 2007, 2008, it got up to $17,000. But if you had the burden of proof of proving the conversion, just showing a gap doesn't prove a conversion. That doesn't prove that she converted it to her own use. I mean, if you're in an accounting situation or whatever, if it was an action for accounting, it might be different. That's not what was going on here. I mean, if you are pursuing a cause of action that requires you to prove conversion, you don't prove it just by showing the numbers don't add up. She was the only one that was exercising power over the account. It was her own testimony that I think, if I may finish my sentence, that I would submit any reasonable jury could infer from that, well, if she says it's accounted for by A,  and C, and after we account for A, B, and C, there's a whole lot of money left over, she's going to have to pay for it. I think a reasonable jury could infer from that, well,  it went? The person who's cashing the checks. Thank you, Your Honor. Thank you both for your briefs and arguments. These are complicated cases. Obviously, families are here and they're affected by it. We'll make our decision as quickly as possible and based on the law. Thank you, Your Honor.